E-FILED
Thursday, 26 May, 2016  03:45:33 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORRIE BURKE on behalf of D.L., a minor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 14-cv-3335 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lorrie Burke (Burke) appeals from the denial of her minor daughter D.L.'s application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381a and 1382c.[1]  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Burke has filed a Brief in Support of Complaint (d/e 18), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 22).  The parties consented, pursuant to 28 U.S.C. § 636(c)

---

[1] Burke's last name was different at the time she filed the application for SSI.  See R. 161. Her last name was the same as D.L.  Burke's last name changed to Burke sometime after September 20, 2013.  See Certified Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), 7.  Burke apparently took the last name of D.L.'s father.  The Court uses "Burke" to avoid using D.L.'s last name in the Opinion.

to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a</u> <u>United States Magistrate and Reference Order entered July 9, 2015</u> <u>(d/e 15)</u>.  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENTOF FACTS

D.L. is a girl who was born on May 22, 2000.  D.L. suffers from attention disorder hyperactivity disorder, combined type (ADHD), oppositional defiant disorder (ODD), and depressive disorder.  R. 24.

On May 18, 2009, D.L. took a battery of intelligence tests at school. She took the Wechsler's Adult Intelligence Scale IV test (WISC IV) and scored P104, V93, and F99.  She took the Wechsler Individual Achievement Test II (WIAT II) and scored 98 in reading, 105 in writing, and 102 in math.  R. 221, 325.  The 98 reading score was in the 45th percentile, the 102 math score was in the 75th percentile, and the 105 writing score was in the 63rd percentile.  R. 204.

On December 12, 2010, psychiatrist Dr. Ronald G. St. Hill, M.D., prepared a psychiatric evaluation of D.L. for ADHD.  R. 294-96.  Dr. Hill assessed ADHD inattentive type and assigned a Global Assessment of

Functioning (GAF) Score of 53.[2]  D.L. lived with her father at this time.  He found no significant medical problems.  D.L. reported that she previously had psychiatric treatment and counseling for ADHD.  Dr. Hill noted D.L. showed some oppositional behavior at home but mostly in the context of her father's inability to set appropriate limits at home.  D.L. was taking Clonidine before bed to help her sleep.  Dr. Hill recommended additional medication.  R. 296.

On July 25, 2011, Burke took D.L. to see psychiatrist Dr. David E. Goldman, D.O., for a psychiatric evaluation.  D.L. was living with Burke and her brother and sister at this time.  D.L. was polite and cooperative, and maintained good eye contact.  D.L. was responsive to all Dr. Goldman's questions.  D.L. was oriented.  D.L. showed no psychomotor agitation or psychomotor retardation.  D.L. had no eccentricities in speech.  R. 318. D.L. was attending Hannibal Middle School in Hannibal, Missouri.  Burke reported that D.L. had difficulty paying attention.  Burke reported that she was bipolar and D.L.'s father was bipolar, and Burke stated that she saw "the same characteristics in her and her father as I see in myself.  I'm

---

[2] A GAF is measure of a clinician's judgment as to the individual's overall level of functioning or the severity of the individual's symptoms.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000)</u>, at 32-34.The American Psychiatric Association no longer recommends the use of the GAF score.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5)</u>, at 16.

bipolar and ADHD."  R. 319.  Dr. Goldman assessed ADHD, combined and rule/out bipolar disorder.  Dr. Goldman assessed a GAF score of 45. R. 319.  Dr. Goldman prescribed Adderall and Risperdal.  R. 320.

On August 25, 2011, D.L. and Burke saw Dr. Goldman.  Burke reported that the Adderall was 'semi-working.  It's almost there but not quite."  R. 317.  Dr. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations. Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others.  Dr. Goldman increased the dosage of Adderall. R. 317.

On October 14, 2011, D.L. and Burke saw Dr. Goldman.  D.L. and Burke reported that sometimes the medication worked and sometimes it did not.  Dr. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations.  Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or

harm to others.  Dr. Goldman changed the dosages of Adderall and Risperdal and added Hydroxyzine.  R. 316.

On December 14, 2011, D.L. and Burke saw Dr. Goldman.  D.L. planned to visit with her father for two hours the next Saturday.  Burke reported that D.L. was fighting with her brother and sister.  Burke reported that school had been "okay."  D.L. and Burke reported that D.L.'s sleep "fluctuated."  Dr. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations.  Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others.  Dr. Goldman increased the dosage of Risperdal.  R. 315.

On January 30, 2012, D.L. and Burke saw Dr. Goldman.  Burke reported, "She does good at school.  It's when she gets home she won't do it."  Burke reported when D.L. took the Risperdal, "she's a lot calmer."  D.L. and Burke reported that D.L.'s sleep was good.  Dr. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations,

or suicidal or homicidal ideations.  Dr. Goldman noted an absence of

aggression, no psychosis, and no risk of suicide or harm to others.

Dr. Goldman changed the dosage of Risperdal.  R. 314.

On February 9, 2012, D.L.'s sixth grade reading and English teacher

Jenni Sanders completed a Teacher Questionnaire.  R. 208-15.  Sanders

reported that D.L. was reading at a fifth grade level.  Sanders reported that

D.L. was "absent a lot."  D.L. had 38 attendance incidents due to illness,

court, and transportation issues.  R. 208.

The Teacher Questionnaire asked the teacher to evaluate the student

in six Domains listed in the Social Security regulations for evaluating the

functional abilities of children:  Acquiring and Using Information; Attending

and Completing Tasks; Interacting and Relating with Others; Moving about

and Manipulating Objects; Caring for Herself;  Health and Physical Well-

Being .  20 C.F.R. § 416.926a(d).

The Teacher Questionnaire listed ten subcategories under the

Domain of Acquiring and Using Information.  Sanders opined that D.L. had

serious problems with five of these subcategories and very serious

problems with two of the subcategories.  Sanders stated:

> [D.L.] does not follow instructions.  She refuses to try even on
> the most basic assignments.  She manipulates & deceives.
> She often has asked to use the restroom, and has been caught
> using the phone instead.  She often comes to school unkept

(sic) & unclean.  [D.L.] does not come to class prepared with homework or materials.

R. 209.

The Teacher Questionnaire listed thirteen subcategories in the domain of Attending and Completing Tasks.  Sanders opined that D.L. has very serious problems in seven subcategories and serious problems in one subcategory.  Sanders stated:

> [D.L.] will often respectfully listen to direction if spoken to directly.  Rarely does she comply with oral directions.  She refuses to read written directions.  Her rate of work is due to her unwillingness and lack of care and effort.

R. 210.

The Teacher Questionnaire listed thirteen subcategories in the domain of Interacting and Relating with Others, and seven subcategories in the domain of Moving about and Manipulating Objects.  Sanders opined that D.L. had no problems in any of the subcategories of either of these two domains.  R. 211-12.

The Teacher Questionnaire had ten subcategories in the Domain of Caring for Himself or Herself.  Sanders opined that D.L. had a very serious problem in one of the ten subcategories, serious problems in two of the subcategories, no problem in five of the subcategories, and an obvious

problem in one subcategory.[3]  Sanders stated, "She only asks for help before an immediate negative consequence."  R. 213.

The Teacher Questionnaire contained a final domain of Medical Conditions and Medications/Health and Physical Well-Being.  Sanders had no opinions regarding this domain.  Sanders stated that D.L. had eyeglasses, but did not wear them.  R. 214.

On February 16, 2012, D.L. and Burke saw Dr. Goldman.  Burke reported that D.L. was "starting to do better."  Burke reported that D.L. received four F grades at school.  Burke stated, "She doesn't bring the homework home."  D.L. reported that she felt that the medication helped.  Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations.  Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others.  Dr. Goldman left D.L.'s mediations unchanged.

On February 27, 2012, state agency psychologist Dr. Mark Altomari, Ph.D., prepared a Childhood Disability Evaluation Form.  R. 323-28.  Dr. Altomari opined that D.L. had less than marked impairments in Acquiring

---

[3] The response to one of the categories was marked "unknown".

and Using Information, Attending and Completing Tasks, and Caring for Herself; and no impairments in the Domains of Interacting and Relating with Others, Moving About and Manipulating Objects, and Health and Physical Well-Being.  R. 325-26.  Dr. Altomari stated D.L.'s WISC IV scores put D.L. "in the average range."  Dr. Altomari stated that D.L.'s achievement scores "indicate she is learning normally."  R. 325.

On March 7, 2012, Burke spoke by telephone to D.L.'s counselor Community Service Specialist Karen Clayton, BS/CSS.[4]  Burke reported that D.L. wrote a $10 check for Hoops for Heart at school.  Burke had to go to the school to pick up the check.  R. 408.  The next day D.L. and Burke met with Clayton.  D.L. received three days of IBS for issuing the "forged check."[5]  Clayton stated that D.L. "explained how it was an error in her environment which could have been prevented."  D.L. reported that D.L.'s aunt was upset.  D.L. wrote a letter of apology presumably to her aunt.  Clayton counseled D.L. on making "positive" choices instead of "negative" choices.  R. 406.

On March 13, 2012, Burke canceled an appointment with Counselor Clayton because D.L. wanted to stay all night with a friend.  Burke reported that D.L. "was learning to make better choices."  R. 405.

---

[4] CSS stands for Community Service Specialist.  See R. 427.
[5] The Court assumes IBS stands for in-building suspension.  From the context, the IBS is some form of discipline administered by the school.

On March 20, 2012, Burke spoke by telephone to counselor Clayton. Burke reported that D.L. threw a fit at the dentist's office. D.L. spoke to Clayton and started crying. D.L. stated that she could not find her tray of medications. Clayton coached D.L. on breathing techniques to calm down. R. 404.

On April 2, 2012, D.L. and Burke saw Dr. Goldman. Burke reported problems with temper tantrums. Burke stated, "It was so bad I had to call the Crisis Line on her." Burke reported that when she asked D.L. to do something, D.L. would throw temper tantrums with yelling and screaming. Burke reported also that the medications were "working good. It's just the defiance." Burke also reported that D.L. was failing two classes in school. Burke reported that D.L. was seeing counselor Clayton once a week. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control. Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations. Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others. Dr. Goldman continued the current treatment regimen. R. 433.

On April 12, 2012, D.L. met with Clayton at D.L.'s home after school. D.L. was clean and well groomed.  R. 365.

On April 18, 2012, D.L. and Burke met with counselor Clayton. Clayton confirmed at this session that D.L. and her siblings "were doing fine."  R. 364.  On April 19, 2012, D.L. and Burke met with Clayton again. Clayton noted that D.L. was making progress helping the family.  D.L. was choosing to work hard to clean the house.  Burke and her sister complimented D.L. for helping to clean the house.  R. 362.  D.L.'s family was cleaning the house in anticipation of a visit from a DCFS representative; the representative, however, did not show up as scheduled. R. 364.

On June 14, 2012, D.L. and Burke met with counselor Clayton. Clayton noted that D.L. was clean and well groomed.  D.L. "identified positive choices like 'sticking to her chore chart and listening to her mother."  R. 354.

On August 13, 2012, D.L. met with a new counselor Community Support Specialist Megan Underhill, BSW/CSS.  Underhill met with D.L. to develop an "initial rapport" with D.L.  Underhill also went with D.L. to Hannibal Middle School to lower D.L.'s anxiety about the new school year by helping D.L. find her classrooms and locker, and meet her new

teachers.  Underhill noted that "[D.L.'s] overall hygiene was lacking but appeared clean."  R. 351.

On October 22, 2012, D.L.'s school district issued a new Individualized Education Program (IEP) for D.L.  The IEP stated that D.L. had a hard time sitting still, staying on task, keeping attention, and focusing on assignments.  She also had problems turning in completed homework. The IEP stated that as her strengths, "[D.L.] does very well with her fluency and expression during reading time.  She is a very agreeable young lady and wishes to do well.  It appears that she is doing better during 6th grade than 7th."  R. 379.  The IEP also stated D.L. did not exhibit behaviors that impeded her learning or that of others.  R. 382.

On June 27, 2012, D.L. and Burke saw Dr. Goldman.  Burke reported that D.L. was getting ready for a pageant scheduled for July 6-8, 2012. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations.  Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others.  Goldman continued the current treatment regimen. R. 432.

On August 20, 2012, D.L. and Burke saw Dr. Goldman.  Burke referred to D.L. as "Miss Attitude."  Burke reported that representatives of the Illinois Department of Children and Family Services (DCFS) suggested behavioral probation for D.L.  Burke reported, "One minute she's fine—the next minute she blows up, the next minute she's fine."  R. 431.  Dr. Goldman's mental status examination found normal appearance, behavior, activity level, orientation, speech, affect, thought process, insight, judgment, cognition and impulse control.  Dr. Goldman also found no delusions, hallucinations, or suicidal or homicidal ideations.  Dr. Goldman noted an absence of aggression, no psychosis, and no risk of suicide or harm to others.  Goldman added Lexapro to D.L.'s treatment regimen at Burke's request.  R. 431.

On August 23, 2012, D.L. was registered for the seventh grade at Hannibal Middle School.  Burke was listed as the primary parent for D.L.  The registration form listed as "Alternate Parent" Nikki Lyng, Juvenile Officer.  R. 372.

On August 28, 2012, D.L. and Burke saw D.L.'s counselor Underhill.  Underhill noted that D.L. was referred recently to the juvenile office.  D.L. reported that she was referred because "me and my siblings don't get along."  Underhill stated that an intensive in home services worker Jamie

McCoy recommended moving D.L. to the Shiloh Christian Children's Ranch "if things do not get better within the home." D.L. reported that her new medication "makes me really tired and hard for me to get up in the mornings." R. 349.

On September 12, 2012, Dr. Goldman completed a form entitled, "Medical and Functional Capacity Assessment." R. 331-36. Dr. Goldman diagnosed D.L. with ADHD, combined type; depression not otherwise specified; and rule out of bipolar disorder. R. 331. To support his diagnosis, Dr. Goldman stated that he relied on clinical findings and objective signs of "Anger outbursts," "Arguing with siblings," and "Difficulty focusing and concentrating." R. 331.

Dr. Goldman opined that D.L. was moderately impaired in Acquiring and Using Information; extremely impaired in Attending and Completing Tasks; not impaired in Moving About and Manipulating Objects; markedly impaired in Caring for Herself; and extremely impaired in her Health and Physical Well-Being. R. 332-35. To support his opinion of D.L.'s extreme impairment in Attending and Completing Tasks, Dr. Goldman's stated that D.L. was "unable to focus and complete tasks at home and at school." R. 333. To support his opinion of D.L.'s marked impairment in Caring for Herself, Dr. Goldman's cited, "mood instability." R. 335. To support his

opinion of extreme impairment in Health and Physical Well-Being, Dr. Goldman cited, "Extreme mood lability and instability," "Daily anger outbursts," and "Daily oppositional and defiant episodes."  R. 335.

Dr. Goldman opined that D.L.'s limitations in Interacting and Relating with Others depended on the other individuals involved.  Dr. Goldman opined that D.L. was moderately impaired in interacting and relating with age contemporaries; markedly impaired in interacting and relating with adults and authority figures; and extremely impaired in interacting and relating with her siblings.  R. 334.  To support these opinions, Dr. Goldman stated that D.L. was, "unable to interact civilly [with] her siblings."  R. 334

Dr. Goldman concluded, "Pt. experiencing ADHD combined type/Oppositional Defiant D/O, Depressive Disorder (with signs and symptoms of Bipolar Disorder components)."  R. 336.

On September 13, 2012, D.L. and Burke met with counselor Underhill.  D.L. made a "Calming Jar" at this session.  The Calming Jar was "meant to be used at times when [D.L.'s] feelings become so overwhelmed, angry and or not in control."  Underhill noted that, "This activity challenged [D.L.] to follow detailed instructions, maintain attentive behavior and implement as needed."  D.L. completed the task during the session.  R. 345.

On September 25, 2012, D.L. saw counselor Underhill.  D.L. reported that she was absent from school four times because of over sleeping and was failing two classes as a result.  D.L. planned to complete missing work and extra credit projects to bring up her grades in these classes.  Underhill stated that D.L. and her brother were placed on probation by the Juvenile Office for yelling in the home.  D.L. was getting along better with her sister.  R. 453-54.

On January 9, 2013, Emilee Hill, MEC, LPC, prepared an Annual Psychosocial/ Clinical Assessment (Annual Assessment) of D.L. for the Missouri Department of Mental Health Division of Psychiatric Services (Missouri Department).  R. 422-27.  Hill prepared the Annual Assessment to determine whether the Missouri Department would continue to provide service to D.L.  At this time, D.L. lived with Burke, her father, her brother, and her sister.  Burke denied that that she had problems with D.L. stealing.  R. 425.

The mental status examination for the Annual Assessment noted adequate hygiene, normal speech, cooperative behavior, and normal flow of thought.  D.L. denied any suicidal or homicidal ideations, hallucinations, or delusions.  R. 424.

Burke stated that she wanted D.L. to continue to receive services because "her temper, getting homework done on time, organization, to keep her straight because she's doing better on her medicines. Her grades have started climbing." D.L. stated that she wanted to continue working on her attitude, "Work on screaming and yelling." D.L. stated, "With my medicine I focus better. And to get all my assignments in on time and make good grades." R. 423.

Burke reported that D.L. was on probation with the juvenile office. D.L. stated that she was on probation for her attitude and that she would be getting off probation in March 2013. R. 423.

D.L. reported that she continued to have outbursts of anger. Burke reported that "once in a blue moon she gets physical." R. 424. D.L. reported that her medications helped with her anxiety, concentration, and focus. D.L. denied any depressed mood, hallucinations, delusions, or suicidal or homicidal ideations. Hill's mental status examination of D.L. was normal. R. 424.

D.L. reported that she was in the seventh grade at Hannibal Middle School. Burke denied that D.L. had any discipline problems at school. D.L. and Burke reported that she was having problems missing school work and

was absent due to illness.  D.L. reported she was getting Fs in some classes and Cs or better in the rest.  R. 425.

D.L. reported that at home she was "responsible for dishes, bathroom, her room, and helping with laundry."  D.L. reported that she was "pretty good" with her chores, and Burke reported that "sometimes she does good."  Hill also noted that D.L. knew how to use the microwave and could make small meals for herself, and D.L. sometimes helped with grocery shopping and meal planning.  R. 425.

The Annual Assessment listed D.L.'s diagnoses of ADHD combined type; depressive disorder; oppositional/defiant disorder; and rule out bipolar disorder.  Hill listed a current GAF score of 41, with a past score of 44. R. 424.  Emilee Hill recommended providing continued services for D.L. Dr. Goldman, counselor Underhill, and Underhill's supervisor also signed the Annual Assessment.  R. 427.  Representatives of the Missouri Department prepared an Individual Treatment and Rehabilitation Plan for D.L.  Dr. Goldman participated in the preparation of the formulation of the plan.   The plan reiterated the GAF scores of 41 current and past score of 44.  R. 435.

On January 31, 2013, D.L. and Burke saw Dr. Goldman.  Burke reported, "We're good."  Burke reported that D.L. was bringing up her

grades.  D.L. stated, "I brought my 2 F's up to B's."  Dr. Goldman's mental

status examination found normal appearance, behavior, activity level,

orientation, speech, affect, thought process, insight, judgment, cognition

and impulse control.  Dr. Goldman also found no delusions, hallucinations,

or suicidal or homicidal ideations.  Dr. Goldman noted an absence of

aggression, no psychosis, and no risk of suicide or harm to others.  Dr.

Goldman continued D.L.'s treatment regimen.  Dr. Goldman noted that D.L.

would try taking the Hydroxyzine to help her sleep.  R. 429.

On June 13, 2013, the Administrative Law Judge (ALJ) held an

evidentiary hearing on D.L.'s application for SSI.  D.L. and Burke appeared

along with their counsel.  R. 40-74.

D.L. testified that she lived with her mother, father, brother, and

sister.  She was born on May 22, 2000, and was thirteen years old at the

time of the hearing.  Her brother was 14 and her sister was 17.  R. 45.

D.L. testified that in a typical day she got up at 7:00 a.m., got dressed

and rode the bus to school.  D.L. testified that she did not need any

reminders or help getting ready for school.  R. 45.  D.L. testified that she

walked to the bus stop with her brother.  R. 46

D.L. testified that she took Adderall four times a day.  She took it

once before she left for school, twice at school, and once after school at

home at 4:00 p.m.  R. 45-46.  D.L. testified that she took Adderall to help her concentrate.  She testified that the medicine helped her concentrate sometimes.  She testified that the Adderall did not help her concentrate approximately two out of seven days a week, usually Monday and Sunday. R. 46-47.  D.L. testified on those days she had problems listening and being tired.  R. 47.

D.L. testified that she attended a special education class called Strategies.  D.L. testified that the Strategies class "helps you like make up your work like when you're having trouble turning it in and stuff."  R. 48. She attended Strategies class every day at school.  She testified that she did her homework for other classes in Strategies.  She received help with her homework in the Strategies class if she asked for it.  D.L. testified that she was in Strategies because she had trouble the year before turning in her homework.  She did the work, but did not turn it in.  R. 48.  She testified that she did not take work home now because she completed the work in the Strategies class.  R. 48.

D.L. testified that she had problems concentrating in class.  She had problems "Not following directions and talking to my friends." R. 49.  She testified that her friends kept her from concentrating.  She testified that she remembered what the teacher told her most of the time.  R. 49.

D.L. testified that she did not have any problems taking her medicine. She testified that the medicine made her tired.  R. 50.

D.L. testified that she did not have any problems getting along with her friends at school.  She testified that she had problems getting along with her siblings at home.  She testified that her siblings got on her nerves. She testified that she had arguments with them.  She testified, "We yell and scream at each other."  R. 51.

D.L. testified that she sometimes had problems with adults.  She had problems, "Doing my chores the most."  She testified that the problems arose because of her "Not wanting to do them."  She testified that she had to go to her room or she got grounded when she refused to do her chores. She testified that she had arguments with her parents about issues such as chores sometimes, but not very often.  R. 51.

D.L. testified that she did not have problems with her teachers at school.  She testified that she did not have problems being disciplined at school.  R. 52.

D.L. testified that twice a month she had bad days when she did not want to do anything.  On those days she either sat in her room, or if she had school, she sat doing her work.  D.L. testified that she had problems with anger when she did not understand her school work or when people

got on her nerves.  She testified that her moods sometimes changed

quickly from happy to sad or bad.  She testified that this quick change in

mood occurred about twice a month.   R. 52-53.

D.L. testified that she took Hydroxyzine to help her sleep.  She

testified that she took the medicine about 8:00 p.m. before she went to bed.

She testified that an hour usually passed before she fell asleep.  She

testified that she usually woke up about 2:00 a.m. and would be awake for

an hour or two before she fell back asleep.  She testified that she had

problems being tired during the day.  R. 53-54.

D.L. testified that she saw Dr. Goldman about once a month.  D.L.

testified that she saw two different counselors, each counselor once a

week.  D.L. testified that she and the counselor worked on D.L.'s attitude

and behavior, particularly D.L.'s behavior at home.  R. 55-56.

D.L. testified that about once a month she had problems being

around other people.  D.L. testified that she had problems if the other

people made noise or were annoying.  R. 56-57.

D.L. testified that she took her Adderall during the summer as well as

during the school year.  The school nurse gave her the dose that she took

during the school day.  She took the medications on her own at home

during the summer.  R. 58.

D.L. testified that she has been often grounded during the summer. When she was not grounded, she spent time with her friend who lived down the street. She went to sleepovers at her friend's house. She took her medicines at her friend's house on those occasions.   R. 58-59.

Burke then testified.[6]  Burke testified that D.L. had been diagnosed with ADHD, ODD, posttraumatic stress disorder, and possible bipolar. R. 60.  Burke testified that D.L. took Adderall three times a day at 8:00 a.m., 12:00 p.m., and 4:00 p.m.  She testified that "once in a blue moon" D.L. threw a fit about taking her medications.  She testified that D.L. received a couple of lunch detentions at school for not going to see the nurse to take her medications.  Burke testified that she supervised D.L. when D.L. was taking medications at home.  R. 60-61.

Burke testified that D.L.'s medications were effective beginning about fifteen to thirty minutes after D.L. took a dose until about thirty minutes before the next dose.  She testified that "you can see that's it worn off and she's bouncing and defiant again."  R. 61.  Burke testified that the school officials noticed the same pattern. R. 61-62.

---

[6] The witness testified that her first name was Maureen. R. 60.  Other documents in the record state that her first name was "Lorie," "Lorrie," or "Laurie."  Burke's last name changed to Burke sometime after September 20, 2013.  See R. 7.  She apparently took the last name of D.L.'s father.  The name on the Complaint (d/e 1) is Lorrie Burke.

Burke testified that D.L. was going into the eighth grade in the fall. She testified that D.L. received special education in the form of the Strategies class and extra help reading.  D.L. also received extra help if she did not understand a test, "[T]hey would read them to her and kind of walk her through it . . . ."  R. 62.  D.L. had an IEP since kindergarten. R. 63.  Burke testified that school officials were waiting for some test results before revising D.L.'s IEP for the coming school year. R. 62.

Burke testified that about twice a week D.L. had trouble getting out of bed to go to school.  Once she got up, D.L. was able to get herself ready to go to school.  Burke testified that in the past D.L. walked to the bus stop with her brother.  In the coming school year, D.L. would be walking alone to the bus stop because her brother would be in high school.  Burke testified that she had no concerns about D.L. getting to school.  R. 63.

Burke testified that D.L.'s seventh grade teachers had concern with D.L. concentrating and handing in homework on time.  Burke testified that the accommodations D.L. has received have helped, but D.L. still had problems completing work if she did not complete the work in the Strategies class.  Burke testified that in those instances, D.L. did not bring the work home to complete.  R. 63-64.

Burke testified that the last semester D.L. received an A, "a couple" of Bs, "a couple of" Cs, and an F.  D.L. received the F in a class called Industrial Technologies because D.L. did not turn in a "huge assignment that was a major part of her grade."  R. 64.

D.L.'s talked to D.L.'s two counselors about D.L.'s behavior at home, particularly about D.L.'s behavior around her siblings and her "defiance with doing things."  R. 65.

Burke testified that D.L. could concentrate for an hour if she was interesting in what she was doing.  She testified that D.L. paid attention for five to ten minutes if she was not interested in what she was doing.  Burke testified that D.L. avoided doing chores such as cleaning her room.  Burke testified that D.L. had problems interrupting her when she was talking to another adult.  D.L.'s medication seemed to help with this behavior.  Burke testified that D.L. did not have problems working with others.  Burke testified she had problems getting D.L. to change behaviors.  D.L. would "go back to doing what she was wanting to do instead of what she was supposed to do."  R. 66.

Burke testified that D.L. threw a fit about three times a week.  She testified that D.L. usually threw a fit because D.L. did not do what her parents wanted her to do.  D.L. usually would be grounded as a result.  The

situation usually lasted an hour, but could last up to a week if the situation involved chores like cleaning D.L.'s room.  Burke testified that D.L.'s fits were primarily verbal.  Burke testified that "once in a blue moon" D.L. kicked or hit her or D.L.'s siblings during a fit.  R. 67.  Burke testified that D.L. sometimes threw objects owned by her sister.  R. 68.  Burke testified that DCFS put D.L. on "parental supervised probation for six months for screaming and cussing and throwing fits at us."  R. 68.  Burke testified that D.L. did not have similar problems at school.  R. 67-68.

Burke testified that D.L. could not be left home alone unsupervised. She testified that D.L. was "starting to become mature enough that maybe she could be left alone for short periods of time," while Burke ran brief errands.  R. 68.  Burke testified that D.L. could go other places unsupervised.  Burke explained, "I don't trust any of my kids at home.  I mean it's just a parent thing, I think."  R. 68-69.

Burke testified that D.L. sometimes changed moods quickly from being happy to "laying in her bed rolled up in a ball watching TV.  Like she's upset or depressed or something."  Burke testified that D.L. changed moods in this way two to three times a week.  R. 69.  Burke testified that D.L. had crying spells once or twice a month, usually associated with getting in trouble.

Burke opined that D.L.'s biggest problem was a lack of concentration due to ADHD.  R. 70.  Burke testified that she could not evaluate D.L.'s intelligence because of the effects of D.L.'s ADHD.  R. 70.

The ALJ then concluded the hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on July 25, 2013.  R. 21-36.  The ALJ followed a three-step sequential evaluation process set forth in the regulations to determine whether a minor is disabled (Analysis).  Step 1 of the Analysis requires the ALJ to determine whether the minor is engaged in substantial gainful activity.  If not, the Analysis continues to Step 2.  At Step 2, the ALJ determines whether the minor has a medically determinable impairment or combination of impairments that are severe.  At Step 2, an impairment or combination of impairments is severe if the impairment or impairments causes more than minimal functional limitations.  If the minor has severe impairments, the Analysis proceeds to Step 3.  At Step 3, the ALJ determines whether the minor's impairment or combination of impairments medically or functionally meet or equal a listing of impairments in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listings). Medical equivalence is determined by reference to the degree of medical severity set forth in the Listings.

Functional equivalence is determined by assessing the minor's functioning in the six Domains:  (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Herself; and (6) Health and Physical Well-Being.  To be functionally equal to the Listing, the minor must have marked limitations in two of the six domains or an extreme limitation in one of the domains.  20 C.F.R. § 416.926a(b) and (d).

 The ALJ explained the meaning of "marked" and "extreme" limitations under the applicable regulations:

> Social Security regulation 20 CPR 416.926a(e)(2) explains that a child has a "marked limitation" in a domain when her impairment(s) "interferes seriously" with the ability to independently initiate, sustain, or complete activities. A child's day-to-day functioning may be seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. The regulations also explain that a "marked" limitation also means:
>
> > 1. A limitation that is "more than moderate" but "less than extreme."
> >
> > 2. The equivalent of functioning that would be expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
> >
> > 3. A valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and her

day-to-day functioning in domain-related activities is consistent with that score.

4. For the domain of health and physical well-being, frequent episodes of illnesses because of the impairment(s) or frequent exacerbations of the impairment(s) that result in significant, documented symptoms or signs that occur: (a) on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more; (b) more often than 3 times in a year or once every 4 months, but not lasting for 2 weeks; or (c) less often than an average of 3 times a year or once every 4 months but lasting longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

Social Security regulation 20 CPR 416.926a(e)(3) explains that a child has an "extreme" limitation in a domain when her impairment(s) interferes "very seriously" with her ability to independently initiate, sustain, or complete activities. A child's day-to-day functioning may be very seriously limited when her impairment(s) limits only one activity or when the interactive and cumulative effects of her impairments(s) limit several activities. The regulations also explain that an "extreme" limitation also means:

1. A limitation that is "more than marked."

2. The equivalent of functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean.

3. A valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and her day-to-day functioning in domain-related activities is consistent with that score.

4. For the domain of health and physical well-being, episodes of illness or exacerbations that result in

significant, documented symptoms or signs substantially
in excess of the requirements for showing a "marked"
limitation.

R. 23-24.  The claimant has the burden of proof on all three Steps of the

Analysis.  See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

The ALJ determined that Burke met her burden of proof at Steps 1

and 2 of the Analysis.  D.L. was not engaged in substantial gainful activity

and D.L. suffered from the severe impairments of ADHD, combined type;

ODD; and depressive disorder.  R. 24.

At Step 3, the ALJ first found that D.L.'s impairments or combination

of impairments did not medically meet or equal any Listing.  The ALJ

considered the Listings under § 112.00 et seq for Mental Disorders—

Childhood.  R. 24.

The ALJ then found that D.L.'s impairments or combination of

impairments did not functionally meet or equal any Listing.  R. 24-36.  The

ALJ addressed each of the Six Domains.  The ALJ found that D.L. had

marked limitations in the Domain of Attending and Completing Tasks, and

less than marked limitations in all of the other Domains.

The ALJ found that D.L. had less than marked limitations in the

domain of Acquiring and Using Information.  The ALJ relied on D.L.'s 2009

scores on the WISC IV and WIAT II that were in normal ranges; on Dr.

Altomari's opinion that these test scores indicated that D.L. was learning

normally; and Dr. Goldman's opinion that D.L. was moderately limited in

this domain.  R. 26, 29.  The ALJ also relied on D.L.'s improving grades in

January 2013 when the Plaintiff reported she brought two "F"s up to "B"s

and her mother reported "We're good", and on the notes from the February

16, 2012 meeting with Dr. Goldman which stated that D.L. was doing

better.  The ALJ also relied on Dr. Goldman's note on January 30, 2012,

that Risperdal made D.L. calmer, and on counselor Underhill's note on

September 13, 2012, that D.L. followed detailed instructions and

maintained attentive behavior in making a Calming Jar.  R. 29-30.

The ALJ found that D.L. had marked limitations in the domain of

Attending and Completing Tasks.  The ALJ relied on evidence that D.L. had

trouble completing and turning in homework, including Sanders' responses

in the Teacher Questionnaire that D.L. had very serious problems in some

subcategories of this domain.[7]  The ALJ stated that she selected "marked"

because D.L. still attends regular classes at school and D.L. was able to

complete small tasks for herself, such as using a microwave and making

small meals.  R. 31.   The ALJ also relied on Dr. Hill's GAF score of 53

---

[7] The ALJ erroneously referred to Sanders as Emily Price.  Price apparently completed and signed a two-page Request for Administrative Information form.  R. 204-05.  Sanders' Teacher Questionnaire accompanied the Request for Administrative Information.  R. 206-15. The ALJ erroneously concluded that Price completed the Teacher Questionnaire.

(indicating moderate symptoms) to the extent that the score represents overall functioning.  R. 26.

The ALJ found that D.L. had no limitations in the domain of Interacting and Relating with Others.  The ALJ relied on portions of the October 22, 2012, IEP that indicated D.L. behaved well at school, could communicate effectively, and did not exhibit behaviors that impeded her learning or that of others; and Sanders' opinion that D.L. had no problems observed in this Domain.  The ALJ also relied on Burke's report that D.L. wanted to stay overnight with friends and was making better choices.  The ALJ also relied on counseling notes on April 18 and 19, 2012, that D.L. was receiving complements from her mother and sister for making good choices to work hard and clean the house, and that D.L. was "doing fine" with her siblings.   R. 27, 32.

The ALJ found that D.L. had less than marked limitations in the domain of Caring for Herself.  R. 34-35.  The ALJ noted that D.L. had problems taking care of herself and keeping herself from harm.  The ALJ found that the limitations in this domain were less than marked because D.L.'s mental status examinations were normal and in particular the 2013 Annual Assessment mental status examination noted that her behavior was cooperative; and because D.L.'s medications alleviated symptoms that

affected this domain.  R. 34-35.  The ALJ also relied on counseling notes

from Clayton and Underhill that D.L. appeared clean and well-groomed,

and on Dr. Altomari's opinion that D.L. had problems with coping, hygiene

and asking for help, but the limitations were less than marked.  R. 26, 34.

The ALJ also relied on Sanders' opinion that D.L. had a very serious

problem in only one of the ten subsections of this Domain set forth in the

Teacher Questionnaire.  R. 27.

The ALJ found no limitations in the other domains of Moving About

and Manipulating Objects and Health and Physical Well-Being.  R. 32-35.

The ALJ discounted Dr. Goldman's opinion that D.L. had extreme

limitations in Attending and Completing Tasks; marked or extreme

limitations in Interacting and Relating with Others; marked limitations in

Caring for Herself; and extreme limitations in Health and Physical Well-

Being.  The ALJ found these opinions were inconsistent with the other

evidence in the record and inconsistent with his own treatment notes.  The

ALJ cited treatment notes in which Burke reported that D.L. was doing well

in school and that her Risperdal made her calmer.  The ALJ also relied on

Dr. Goldman's consistent normal findings in D.L.'s mental status

examinations and his repeated findings "that aggression, suicide risks,

psychosis, and risk to others was 'absent.'"  The ALJ concluded, "Dr.

Goldman's treatment records, which document progress and do not document any 'extreme' functional impairments, are inconsistent with his opinions . . . .  Accordingly, I give his overall opinion partial weight."  R. 27.

The ALJ discounted the significance of the GAF scores.  The ALJ stated that represented "a clinician's judgment as to the individual's overall level of functioning or the severity of the individual's symptoms as of the day and the hour the assessment is made."  R. 27. As a result, a GAF score may relate only to the severity of symptoms rather than the severity of functional limitations.  The ALJ stated, "[T]he GAF score may have little or no bearing on an individual's social or occupational functioning."  R. 28. The ALJ also stated that a GAF score was highly subjective and limited to a specific point in time.  The ALJ gave the GAF scores in D.L.'s records little weight because the evidence showed improvement over time and because her mental status examinations were within normal limits.  R. 28.[8]

The ALJ concluded that D.L. did not functionally meet or equal a Listing because she was not extremely limited in any domain and was not

---

[8] The Court notes that the American Psychiatric Association no longer recommends using GAF scores. American Psychiatric Association, DSM-5, at 16 ("It was recommended that the GAF score be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").  See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (GAF rating "does not reflect the clinician's opinion of functional capacity" because the rating measures the worst of symptoms or functional level, not just functional capacity.).  But see Price v. Colvin, 794 F.3d 836, 839-40 (7th Cir. 2015) (ALJ cannot ignore a low GAF score).  The ALJ here did not ignore D.L.'s GAF scores.

markedly limited in two domains.  The ALJ, therefore, concluded that D.L. was not disabled.  R. 36.

Burke appealed the ALJ's decision on behalf of D.L.  On September 23, 2014, the Appeals Council denied the request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Burke then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's findings are supported by substantial evidence.  D.L.'s impairments do not medically meet or equal a Listing.  D.L. and Burke do not dispute this finding.

The ALJ's decision that her impairments or combination of impairments do not functionally equal a Listing is supported by substantial evidence.  The finding that D.L. is less than markedly limited in the Domain of Acquiring and Using Information is supported by the opinions of Drs. Goldman and Altomari, by D.L.'s normal test scores, by the treatment and counseling notes cited by the ALJ, and by D.L.'s improving grades.  The finding that D.L. is markedly limited in the Domain of Attending and Completing Tasks is supported by Sanders' Teacher Questionnaire and by the fact that D.L. is attending regular classes at school except for the Strategies class.  These two factors support the ALJ's decision to find D.L.'s limitations in the Domain was marked rather than extreme.

The ALJ's findings that D.L. had no limitations in the Domains of Moving About and Manipulating Objects and Health and Well-Being are supported by substantial evidence.  Burke does not challenge these findings on appeal.

The finding that D.L. had no limitations in the Domain of Interacting and Relating with Others is supported by the October 22, 2012 IEP that

indicated D.L. behaved well at school, could communicate effectively, and did not exhibit behaviors that impeded her learning or that of others; and by Sanders' opinion in her Teacher Questionnaire that D.L. did not have problems in this Domain.  The ALJ's findings were also supported by evidence that she had friends among her peers, and the evidence cited by the ALJ that she could get along with her siblings.

D.L., however, clearly had repeated problems interacting with her siblings, and some problems interacting with her parents.  This contrary evidence indicates that the ALJ should have found some level of limitation in this Domain.  The ALJ's error, if any, was harmless because the overall evidence supports a finding that D.L.'s limitations in this Domain were less than marked.  A marked limitation must seriously interfere with the child's ability to initiate, sustain, or complete relevant activities.  20 C.F.R. § 416.926a(3)(2).  The 2012 IEP, Sanders' Teacher Questionnaire, and D.L.'s ability to relate to her peers supports the ALJ's conclusion that D.L.'s impairments did not seriously interfere with her ability to interact and relate with others outside her family.  She only had problems with her siblings and, to a lesser extent, with Burke.  The evidence on which the ALJ relied supports the conclusion that D.L.'s limitations in this Domain were less than marked.

The ALJ's finding that D.L. was not markedly limited in the Domain of Caring for Herself was supported by the findings in the 2013 Annual Assessment mental status examination that D.L.'s behavior was cooperative; by the evidence that D.L.'s medications were effective; by Sanders' opinion that D.L. had no problem in five of the ten subcategories of this Domain on the Teacher Questionnaire, and a very serious problem in only one subcategory; and by the counseling notes that showed D.L. appeared clean and well-groomed.  This evidence supported the ALJ's conclusion that D.L. had some limitations in the Domain, but those limitations were less than marked.

The ALJ's findings that D.L. was not extremely limited in any domain, and was markedly limited in only one domain, supports her conclusion at Step 3 that D.L. was not disabled.  The ALJ's decision was supported by substantial evidence.

Burke argues that the ALJ erred in not giving controlling weight to the opinions of D.L.'s treating psychiatrist Dr. Goldman.  A treating physician's opinion are to be given controlling weight if they are well-supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2).

The ALJ did not give controlling weight to Dr. Goldman's opinion because the ALJ found that his opinions were inconsistent with other evidence in the record and inconsistent with his own treatment notes. Substantial evidence supports that conclusion. Burke concedes that Dr. Goldman's opinion that D.L. was extremely limited in the Domain of Health and Well-Being was contrary to other substantial evidence in the record. Dr. Goldman's opinion that D.L. was extremely limited in the Domain of Attending and Completing Tasks was contradicted evidence in the record including Dr. Goldman's treatment notes that showed the ability to improve grades periodically; D.L.'s testimony that she was able to complete all of her assignments for her regular classes in the Strategies class; and by treatment notes and testimony that D.L.'s medications were effective in controlling her ADHD.

Dr. Goldman's opinion that D.L. is markedly impaired in the Domain of Caring for Herself was contradicted by evidence that she took care of her personal hygiene and grooming and by the finding in the 2013 Annual Assessment mental status examination that D.L.'s behavior was cooperative.

Contrary to the design of the Functional Capacity Assessment form, Dr. Goldman gave three discrete opinions regarding the Domain of

Interacting and Relating with Others and did not directly opine whether D.L. was overall markedly limited in this Domain.  Furthermore, Dr. Goldman's opinion regarding interacting with adults was contradicted by the finding in the 2013 Annual Assessment mental status examination that D.L.'s behavior was cooperative in school and by Sanders' opinion that D.L. had no observable problems in this Domain.  Under these circumstances, the Court sees no error in the ALJ's decision to discount the weight to be given to his opinions in this Domain.

Burke argues that other evidence in the record supports some of Dr. Goldman's opinions.  The evidence cited may be consistent with Dr. Goldman's opinions.  Dr. Goldman's opinions are still inconsistent with the substantial evidence in the record relied on by the ALJ.  The ALJ, therefore, did not err in deciding not to give controlling weight to Dr. Goldman's opinions.  The reasons given by the ALJ for not giving controlling weight to Dr. Goldman's opinions are adequate and are supported by substantial evidence.  Here the ALJ provided a sufficiently sound explanation for her rejection of Dr. Goldman's opinions.  See Schreiber v. Colvin, 519 Fed.Appx. 951, 959 (7th Cir. 2013).

Burke argues that the ALJ erred in not finding marked limitations in the Domains of Interacting and Relating with Others and Caring for Herself.

The Court disagrees.  The Court has carefully reviewed the record and finds that the evidence cited by the ALJ constitutes substantial evidence sufficient to support the conclusion that D.L.'s limitations in these Domains was less than marked.  Burke essentially asks this Court to reweigh the evidence.  The Court may not do so.  Clifford, 227 F.3d at 869.  The Court only decides whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate."  Richardson, 402 U.S. at 401.  In this case, a reasonable mind might accept as adequate the evidence on which the ALJ relied in deciding that D.L.'s limitations were less than marked in these Domains.  The ALJ's decision was supported by substantial evidence.

THEREFORE Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 22) is ALLOWED, and Plaintiff's Brief in Support of Complaint (d/e 18) is DENIED.  The decision of the Commissioner is AFFIRMED.  THIS CASE IS CLOSED.


ENTER:   May 25, 2016


_____*s/ Tom Schanzle-Haskins*_____
UNITED STATES MAGISTRATE JUDGE